Mr. Chief Justice Sharkey
delivered the opinion of the court.
The appellants filed their bill in chancery for the purpose of enjoining a judgment at law, and for specific performance on the ground that they, as administrators of James Norris, hada title to the negroes which had been sued for. The property in controversy belonged originally to Thomas L. Norris, the brother of James Norris, who died leaving a widow and several children. The widow administered and married a second husband, and not being able to relieve the estate from embarrassment, relinquished the administration, and it was given to James Norris, who, by his economy and good management, relieved it from debt, and ultimately divided the property amongst the widow and children.
During his administration, his right to the distributive share of Mrs. Norris, afterwards Mrs. Fogle, is said to have been acquired in two ways. First, an execution was issued against Fogle, and levied on the individual interest of his wife, in the estate of Thomas L. Norris, which was sold under the execution, and purchased by James Norris. Secondly, it is said that Mrs. Fogle, being desirous to pay off the debts of the estate, together with *504 other debts contracted by her, proposed to James Norris to take the administration, pay off the debts, and he should have her share of the estate when divided in discharge of the advances he would have to make.
In relation to the title acquired under the sheriff’s sale, it has undergone adjudication in the proper tribunals, and has been decided against the claimants; with that, therefore, we have nothing to do. The right acquired by the alleged purchase from Mrs. Fogle, is the one which the complainants rely on, and seek to enforce, and we are, therefore, to inquire 'into its actual existence and validity. It is alleged in the bill, that the estate of Thomas L. Norris was much embarrassed, and that Mrs. Fogle, the ad-ministratrix, being unable to -relieve it, and being herself indebted, requested James Norris to take the administration, and purchase her dower. That said James Norris took the administration, and made advances out of his own funds, in paying off the debts due from the estate, and from Anna Fogle individually, and for her benefit, and at her request, with an express understanding, that said Norris was to have the distributive share of Anna Fogle when the estate should be divided. A declaration made by Anna Fogle is averred in which she said that James Norris had paid on-account of the negroes, including the sum paid at the sheriff’s sale, the sum of eight or nine hundred dollars, and that she thought it right, and would pay twelve and a half per cent, for the use of the money in' case she was ever able to raise the amount necessary to redeem the negroes. It also appears, that after the division the negroes were generally considered by Anna Fogle and others to be the property of James Norris, and that they were, except one, at times in his possession. The allegation in the bill, in regard to the agreement and understanding of the parties is founded on information derived from James Norris in his lifetime. The proof in relation to this agreement, is no less vague and uncertain. Mrs. Mary Norris, the wife of James Norris, states, that she was present, when Anna Fogle insisted on her husband’s taking the administration, and settling the debts, which were then pressing, being in executions in the hauds of the sheriff, and that, as a compensation, she would relinquish her share of *505 the estate to him. That she and her husband Fogle, who had separated from her, had created debts, and she thought it nothing but right, that she should be the loser, and not the children.
The executions mentioned appear to have been against the estate of Thomas L. Norris, and were then in the hands of the sheriff who was present. This is all the evidence in relation to' the agreement, except that it is stated by some of the witnesses, that James Norris claimed her negroes after the division, and that Anna Fogle and her last husband Lisson did not deny his right: She it seems, however, was desirous to redeem the negroes which Norris repeatedly said she might do, by paying twelve and a half per cent, for the use of the mone3r advanced.
The agreement, as thus proved, amounted to nothing more than a mere proposition to sell, on the part of Mrs. Fogle, and there is no evidence that it was acceded to when made. It was not placed in the shape of a contract. The general understanding which appears to have prevailed afterwards, in the family of Norris, that the property was his, was evidently not entirely predicated on this supposed sale, but in part in consequence of that and the advances made, and in part in consequence of the purchase under the sheriff’s sale. The bill expressly so states it to have arisen; and the evidence shows it to have been the case. Both Norris and Anna Fogle, no doubt believed that he had acquired a good title under the sheriff’s sale, and under such belief she in all probability acted, when she admitted his title.
Such also was evidently the opinion of his administrators, and they accordingly tried the strength of that title at law, before they resorted to equity to enforce a performance of the contract. I do not think, therefore, that this impression of the parties, can have much weight in establishing the agreement, which is positively denied by the answers, and must rest solely on the facts above stated by the witnesses. The alleged advances do not create any presumption in favor of a contract to sell, for although it is said that James Norris paid the debts out of his own funds, yet there is nothing to show what amount he advanced, except loose declarations, or on what account it was advanced, whether *506 for the estate, or for Anna Fogle and her husband. If made for the estate, they would not create a lien on the portion of Anna Fogle, more than on the part of the children. If advances were made for Anna Fogle, it is remarkable that James Norris should have kept no account of them, or that there should be no evidence that they were made.
From the view I have taken of the agreement, if such it may be called, it appears to be too uncertain, both as to its terms, and as to the proof of its existence, to justify a confirmation. Courts of equity will not enforce contracts, unless they are certain in terms, and this rule applies with additional force, as between the representatives of the contracting parties. 1 Fonblanque, 173. This too, was an executory contract, and although the parties lived á considerable time after the first conversation on the subject, and after the property was divided, yet no memorandum was ever made in writing. This I take to be an additional evidence, that James Norris supposed he had acquired a good title by the sheriff’s sale.
In addition to the uncertainty of the agreement, Mrs. Fogle was a married woman, and although there is some evidence that she had separated from her husband, yet that in itself did not necessarily enable her to make a valid contract.
If there was any direct evidence of advances to Mrs. Fogle, I should dislike to turn the parties out without relief; but we have-none, and all the evidence calculated to raise a presumption in favor of such advances, would lead to the conclusion that they were most probably made for the benefit of the estate of Thomas L. Norris. That, it appears, was considerably embarrassed, and much of the proof was evidently introduced for the purpose of raising a belief that it it would have been sacrificed, but for the advancements made by James Norris. If this were even true, it would by no means follow that the distributive share of Mrs.F.ogle, was alone liable for the amount. >
The relief afforded to the estate was, perhaps, not more on account of the money, than the economy and good management' of James Norris; for it is proved, in one instance, that, after he *507 had. made himself personally responsible, by giving his own note, he paid the note, or part of it, by the hire of the negroes.
It was urged in the argument of this case, that the merits of the-bill are not open for investigation, but that the party was precluded by the decision on the demurrer. I do not think this position sustainable. The defendants first demurred to the bill, which was overruled by the chancellor. From that decision they took an appeal, as they had a right to do. The decision of the chancellor was sustained, and the parties then answered.. Leave was given to answer when the demurrer was sustained, but the parties I presume, wished the principles of the case settled before they answered, and for that purpose, took the appeal, which is a right given by our statute.
They were not bound to answer before the decision on the appeal, for if it had been decided in their favor, no answer would have been necessary.
I do not think there is any thing to justify a reversal of the decree of the chancellor. It must be affirmed.